**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Robert L. VESCO, et al., Defendants.**

**No. 72 Civ. 5001 (CES).**

United States District Court,
S.D. New York.

Nov. 9, 1981.

Lawrence Toscano, New York City, for plaintiff.

Martin Mensch, Dornbush, Mensch & Mandelstan, Sheldon D. Camhy, Shea & Gould, Bud George Holman, Kelley, Drye & Warren, Eugene R. Anderson, Leon Kellner, Anderson, Russell, Kill & Olick, New York City, R. Kenly Webster, Washington, D.C., Herbert M. Wachtell, Wachtell, Lipton, Rosen & Katz, Raoul Gersten, Hall, McNicol, Hamilton, Clark & Murray, New York City, David T. Hashey, Hanson, Hashey & Scott, Fredericton, N.B. Canada, Russell Sleigh, Jack Hutchings, Lovell, White & King, New York City, Jay Calvert, John Lewis, Morgan, Lewis & Bockius, Philadelphia, Pa., Cornelius M. Ahearn, Jr., Riposanu, Joyce, Ahearn, Aballi & Diaz-Cruz, New York City, John Fowle, McKinney, Bancroft & Hughes, Nassau, Bahamas, for defendants.

### MEMORANDUM DECISION

STEWART, District Judge:

The Securities and Exchange Commission ("SEC") has moved for findings of fact and conclusions of law and entry of an order of disgorgement against Robert L. Vesco, Norman P. LeBlanc, Milton F. Meissner, Ulrich J. Strickler, Stanley Graze, Richard E. Clay and Gilbert R.J. Straub ("the Vesco group"). This opinion constitutes findings of fact and conclusions of law as to some, but not all, of the matters included in the motion.

#### Background

This action was brought by the SEC in November 1972 under section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (1976). Extensive hearings were held on a motion for preliminary injunction during the period March 20, 1973 to May 18, 1973. On September 21, 1973, we entered a default judgment of final injunction against LeBlanc, Bahamas Commonwealth Bank, Ltd. ("BCB"), Overseas Development Bank (Luxembourg) ("ODB Lux"), International Bancorp Ltd. ("IBL"), Value Capital Ltd. ("VCL"), Kilmorey Investments ("Kilmorey"), Global Holdings Ltd. ("GHL") and Global Financial Ltd. ("GFL"). A preliminary injunction was issued on November 8, 1973 against Vesco, Meissner, Strickler, Graze, Straub, Frederic J. Weymar, I.O.S. Ltd., the "Dollar Fund" management companies and Kilmorey. Default judgments were entered against Vesco, Meissner,

Strickler, Clay and Straub in March 1978. LeBlanc and Vesco were held in civil contempt on October 4, 1978 after hearings in August and September 1978. Trial on the permanent injunction was scheduled to begin on December 20, 1978, but neither counsel for the non-settling defendants nor the defendants themselves appeared for trial.

During the course of discovery in this case, many of the individual and corporate defendants settled the litigation with the SEC. Settlements were reached between the SEC and the following individual defendants: Frank G. Beatty, Wilbert J. Snipes, James Roosevelt, Frederic J. Weymar, C. Henry Buhl III, Allan C. Butler, Laurence B. Richardson, John D. Schuyler, Edward A. Stoltenberg, Howard F. Cerny, Allan F. Conwill, Raymond W. Merritt and John S. D'Alimonte. Settlements were also reached with International Controls Corp. ("ICC") and the IOS Dollar Funds [including Fund of Funds, Ltd. ("FOF"), Venture Fund (International) N.V. ("Venture"), International Investment Trust ("IIT"), and Transglobal Growth Fund, Ltd. ("Growth")] and the respective management companies of the Dollar Funds. In addition to the foregoing, the complaint was dismissed against defendants Georges Phillipe, Bank Cantrade, Ltd. and Consulentia Verwaltungs, A.G.

The SEC now moves to convert the preliminary injunction, issued November 8, 1973, against Stanley Graze, into a permanent injunction. The Commission also moves for an order directing Vesco, LeBlanc, Meissner, Strickler, Graze, Clay and Straub to make an accounting to the court for all moneys misappropriated from the IOS Dollar Funds and from other IOS entities and to make restitution for such misappropriation.

*Findings of Fact*

The evidence presented at the 1973 hearings on the preliminary injunction, in the depositions designated by the SEC, and in the testimony and evidence submitted in August and September of 1978 supports a finding of a scheme by Vesco and his group to use ICC to obtain control over the IOS complex, and then to divert substantial assets from the IOS Funds into shell corporations and ultimately into accounts which could be used for the personal benefit of the Vesco group.

*A. Vesco and ICC Acquire Control Over IOS*

IOS, a Canadian company whose "troubled existence" has spawned numerous lawsuits, was essentially a holding company consisting of a complex of mutual funds and investment companies. Its assets consisted primarily of four mutual funds sometimes collectively referred to as the "Dollar Funds," since their investments were principally concentrated in United States securities. They were FOF (and FOF Proprietary Fund ("FOF Prop"), a wholly owned subsidiary), Venture, IIT and Growth. At the end of 1971, the total net assets of these funds exceeded $400 million. Control of these assets rested with four management companies, each of which had a management contract with one of the funds. These four companies were wholly owned by Transglobal Financial Services, Ltd., a subsidiary of IOS. IOS also held through subsidiaries various real estate, banking and insurance assets.

By the spring of 1970, IOS had fallen on bad times, and accounting personnel determined that it was experiencing liquidity problems and needed cash. Vesco learned of IOS's financial position soon thereafter. At this time, he held the position of President and Chief Executive Officer and twenty-six percent of the common stock of ICC, a Florida corporation engaged in the manufacture of machinery and technical instruments. ICC's shares were registered with the SEC and were (and are now) traded on the American Stock Exchange. At an ICC board meeting in September 1970, Vesco presented a loan agreement calling for ICC to lend $10 million to IOS. The Board approved the loan agreement and, in connection with the transaction as agreed upon, designated Vesco and Meissner, then Vice President and Treasurer of ICC Investments Ltd. ("IIL"), a wholly owned subsidiary of ICC, as members of the Board of Directors, Executive Committee and Finance Committee of IOS. Vesco assumed the position of Chairman of the Finance Committee. On September 4, 1970 IIL entered into a loan agreement with IOS, which was subsequently amended twice, un-

der which IIL loaned $5 million to IOS and made available an additional $5 million over a period of several months. Pursuant to the second amendment in January 1971, IIL limited its credit obligation to $5 million and the note evidencing this indebtedness was made payable on demand. Also, IOS agreed to make deposits of $5.5 million in banks designated by IIL and to pledge such accounts to IIL to collateralize IOS' debt to IIL. IOS also agreed to reimburse ICC for expenses incurred by ICC on IOS business.

On January 15, 1971, Linkink Progressive Corp. S.A. ("Linkink"), a Panamanian shell corporation under Vesco's control, purchased about 6 million shares of IOS preferred stock from Bernard Cornfeld, the former principal shareholder of IOS. In May 1971, Hemisphere Financial Services Ltd. ("HFS") (formerly known as American Interland Ltd.), a wholly owned subsidiary of ICC, purchased all outstanding shares of Linkink from Red Pearl Bay, S.A., another Panamanian shell corporation. By March of 1971, the Board of Directors of ICC authorized the formal purchase of IOS shares. HFS then purchased 3,629,739 of IOS stock option shares, in direct contravention of an injunction issued by the Ontario Supreme Court. From January 1971 to December 1971, ICC through its subsidiaries HFS and IIL, acquired approximately 45 percent of the outstanding IOS preferred shares and 28 percent of the outstanding IOS common shares. The preferred shares as a class were entitled to elect two-thirds of the IOS Board of Directors. On February 25, 1971, Vesco was elected Chairman of the Board of IOS.

## B. The Spin-off of IOS Assets

As we have already stated, IOS' principal assets, other than mutual funds, were its banking operations, insurance operations and real estate. In October 1971, IOS transferred its principal banking operations, including ODB Lux, to IBL, a new Bahami-

an corporation, in return for various notes, debentures and common stock. Weymar, a former director of Butlers Bank and a Vesco associate, had purchased the stock of BCB. Simultaneously with its acquisition of the banking assets, IBL sold 30 percent of its shares to Weymar in exchange for all the common stock of BCB. Then in October 1971, the IBL shares received by IOS were distributed to its shareholders. ICC received 1,760,767 common shares of IBL and $1,760,767 of $1 par value 7 percent debentures of IBL. Thus ICC controlled 22 percent of IBL which, when added to the 30 percent owned by Weymar, totaled 52 percent.

A similar transaction was effected with respect to the real estate and insurance assets. By an agreement dated December 14, 1971, IOS transferred to VCL, a Bahamian corporation, certain substantial real estate and insurance assets, including (1) the shares of IOS Real Estate Holdings Ltd. ("IOSREH"), which managed property and held the voting shares of Investment Properties International Ltd. ("IPI")[1], (2) the shares of IPI Management Co., Ltd. and Resources Services Ltd.[2], (3) the shares of certain IOS insurance companies, (4) the right to acquire certain rights and shares of mutual fund management and related companies, and (5) the right to acquire from IOS its equitable right, title and interest in the voting or management shares of certain mutual funds, including the Dollar Funds. In return for these assets, VCL transferred its shares to IOS, which were then distributed to the shareholders of IOS. ICC received through its subsidiaries the sum of 2,360,767 common shares of VCL, giving it a 38 percent controlling interest in VCL. Thus, by the end of 1971, Vesco had achieved substantial control of IOS and spun-off its banking, real estate and insurance assets into new corporations controlled by ICC.

---

1. IPI was a real estate company with net assets of approximately $95 million. The public owned 53 percent of the non-voting stock of IPI; the balance (47 percent) was held by Glob-

al Natural Resources Properties Ltd. ("GNRP").

2. These two companies had management contracts with IPI and GNRP respectively.

## C. The Plan to Close-End the Funds

### 1. ABC N.V. and VCL–IPI–PRL

At the close of 1971, the four Dollar Funds had over $440,000,000 in net assets. Each of the Funds relied heavily in its investment strategy, as stated in the prospectus of each of the Funds, on investments in the United States securities market. All of the Funds were open-ended and highly liquid.

Vesco determined to alter the structure and investment strategy of the Funds by close-ending the Funds. Initially, he intended to carry this out by forming a global corporation to which substantially all the IOS assets would be transferred in return for a one-third interest. ICC would own another one-third interest and the remaining third would be sold to the public. The code name for the proposed corporation was ABC N.V. Essential to the plan was an estimated $150 million believed to be locked into the Funds, the so-called "hot money" which could not be redeemed because it was thought to have been invested in violation of the laws of the investors' countries.

Such a reorganization of IOS into ABC N.V., however, was not accomplished. By early 1972, Vesco had changed his plan to one in which the assets of the various funds (which in large part were readily marketable U.S. securities) would be liquidated and the liquid assets would be reinvested in the new entity, ABC N.V. Vesco envisaged that the new entity was to be a subsidiary of FOF Prop which would purchase $50 million in the stock and debentures of ABC N.V. It was also contemplated that Venture Fund and IIT would make substantial investments in ABC N.V. Since the securities of the latter would have no ready market, close-ending was necessary to avoid the eventuality of insufficient cash for redemptions.

Vesco asked a New York law firm to review his plan. At a meeting in mid-January at the firm's office in New York, a group of lawyers drafted a confidential memorandum analyzing the proposed trans-

action and concluding that such actions might constitute a breach of fiduciary duty by the directors and investment managers of the Funds.

At a subsequent meeting at ICC in Fairfield, New Jersey on January 27, 1972, the ABC N.V. transaction was considered by a group including Vesco, Beatty, Clay, and various lawyers and accountants. The mechanics of setting up the new entity were discussed, as well as the question of how much notice or time must be given to fundholders prior to close-ending their funds.

Vesco also discussed a proposal for the amalgamation of VCL and two valuable entities outside VCL, IPI and GRNP. The code name for the new IOS real estate entity was Newco. Under the proposal, VCL was to receive 10,000 Class A shares of Newco in exchange for the 10,000 voting shares of IPI, which had been placed in VCL pursuant to the December 14, 1971 agreement. VCL was also to receive an additional 6,000,000 non-voting shares of Newco in exchange for other VCL assets including among other things the management contracts for IPI and GNRP, and former IOSREH real estate management assets. The aggregate book value of the foregoing VCL assets was $13 million. Newco was to acquire the net assets of IPI (approximately $95,000,000) for 10,800,000 Newco non-voting shares. VCL was receiving far too many shares for the asset it was contributing compared with the small number of shares IPI was receiving for contributing assets valued at over seven times the VCL assets. It was also contemplated that Newco would acquire the net assets of GNRP (less the 5,100,000 IPI common shares held by GNRP) which net assets had a book value of $31 million for 2,200,000 Newco non-voting common shares.

Both the ABC N.V. and the Newco [3] transactions were opposed by the lawyers who considered the transactions because they considered them of doubtful legality and unfair. It also appeared that ICC, as a controlling shareholder of VCL, could be

---

**3.** Newco ultimately came into being as Proper-   ty Resources Ltd. ("PRL").

charged with a breach of fiduciary duty because of the unfair structure of the proposed transactions. When Vesco informed IOS' Canadian counsel of his intention to pursue the proposed plans, the latter submitted his resignation from any further representation of IOS entities.

## 2. The Kilmorey Transaction

The SEC investigation, which culminated in this proceeding, was begun in the latter part of 1971 and was well underway by the spring of 1972. The minutes of an ICC board meeting on March 9, 1972 indicate that Vesco noted "the harassment tactics used by the Securities and Exchange Commission in its issuance of subpoenas to third parties in connection with its investigation of the Corporation had been injurious to the Corporation's reputation . . .". The minutes of March 28, 1972 state that Vesco "gave an intensive review of the status of the Securities and Exchange investigation of the Corporation and the harassing tactics being employed" by the SEC. These minutes then state that the Corporation had received an offer from Kilmorey Investments Ltd.[4] to purchase ICC's interest in IOS. The board approved the sale.

On March 27, 1972, Vesco wrote a letter to the SEC informing it of ICC's intention to divest itself of IOS shares and their sale to present members of IOS management. Immediately preceding the deadline for ICC's filing with the SEC of its Form 10–K, ICC sold the shares of its two subsidiaries, HFS and IIL, which held the IOS shares (approximately 17,600,000 preferred and 6,000,000 common) to Kilmorey. Prior to the closing, Vesco removed the IBL and VCL shares from HFS and IIL and distributed them as dividends to ICC so that ICC received a 22 percent interest in IBL and a 38 percent interest in VCL. HFS and IIL executed unsecured promissory notes totaling about $650,000 in payment of certain intercompany indebtedness. Also as consideration for the sale of the subsidiaries hold-

ing the IOS shares, ICC received $200,000 in cash and an unsecured promissory note from Kilmorey in the amount of $300,000.

The most substantial consideration, however, purported to be a tax indemnification agreement given to ICC by Kilmorey to indemnify ICC against tax liabilities arising from its investments in IOS. There was testimony indicating that the sole reason for the tax indemnification agreement was so that a $1 million profit would be reported on the transaction. No note supporting the agreement was given by Kilmorey, and the collectability of amounts owed under the agreement was to say the least unclear.

A Form 10–K and press release filed in early April 1972 announced the termination of ICC's control of IOS and its subsidiaries. These statements did not disclose the non-arms length nature of the transaction or the questionable likelihood of payment under the tax indemnification agreement, or Vesco's continued participation in and control of IOS, VCL, IBL and IPI. The Kilmorey transaction accomplished Vesco's objective not only of removing the IOS shares from ICC, but also of separating those shares from the VCL and IBL shares held by ICC.

## D. Transfer of Depository Functions for the Dollar Funds

A traditional selling point of the IOS funds, which was emphasized in their prospectuses, was that substantial and established financial institutions, such as the Bank of New York and Credit Suisse, acted as custodians of cash and securities.

In the period March through October 1972, Vesco and his Group embarked upon a plan to remove independent banks from any control over the cash and securities of the Funds, and to place the Dollar Fund moneys and securities with two banks owned by IBL, BCB and ODB Lux. Vesco and his associates could then exploit the Dollar

4. Kilmorey was a Bahamian shell corporation with authorized capital at that time of $2,000. Its directors, each of whom were the sole officers, were LeBlanc and Strickler, who together

with Meissner and Graze were the sole stockholders. LeBlanc, Strickler and Meissner were directors and all were officers of IOS.

Funds' assets at will. In addition, this aspect of the scheme would provide a ready source of liquid deposits to bolster the financial condition of BCB and ODB Lux.

In March 1972 ODB Lux was made depository of cash for FOF, IIT and Venture Fund in place of Credit Suisse, which had acted as cash depository for these funds until that time. Credit Suisse had total assets of $2.7 billion; for the year ended December 31, 1971, ODB Lux had assets of $24 million and capitalization of $1,250,000. The transfer was made despite the opposition of Solomon, an accountant who was an investment advisor and portfolio manager of IOS funds (he resigned in January 1972 after Vesco arrived on the scene). Solomon testified that he told Vesco that "[ODB Lux] was a tiny bank, and by the standards of the amount of funds we were talking about was probably terribly undercapitalized. I felt that they did not have the mechanical or administrative machinery to handle this. And, lastly, I felt that the prospectus represented to fund buyers that they would have a sizeable international independent bank looking over the custodial function of their funds."

In April 1972 American National Bank & Trust Company of New Jersey was made cash depository for Growth Fund and FOF Prop, in place of Bank of New York ("BONY"). In the fall of 1972, ODB Lux also became the cash depository of these two Funds. Subsequently, BCB was made sub-custodian of cash for ODB Lux and by November 1972 the latter had transferred $176,920,000 to BCB.

Until April 1972 BONY had been custodian of all securities for Venture Fund, FOF, FOF Prop and Growth Fund. It was also sub-custodian for all United States securities of IIT, the primary custodian being Montreal Trust Co. On April 26, 1972 American National was appointed custodian of securities for all of the Funds. Subsequently, in October 1972 American National accepted BCB as sub-custodian of the securities of the Funds.

Earlier, in March 1972, BONY had seriously questioned the transfer of any cash depository functions to ODB Lux. An officer of the bank wrote: "It seemed apparent from the beginning that there was a very real question as to whether or not Bank Luxembourg had the people or the experience to take over the Credit Suisse functions .... it is very obvious that the whole idea behind this new corporate setup is to channel as much cash as possible to ODB Luxembourg. If this comes about it will become difficult to account for Fund cash."

BONY expressed its concern that ODB Lux was undercapitalized and did not have the mechanical or administrative machinery to deal with the custodial functions. There was also good basis for concern about common control. At the time, Meissner was President of IOS and Chairman of the Board of ODB Lux. In May 1972 Clay was elected Chairman of the Board of Directors of ODB Lux. He was also Vice President of ICC, Vice President of IBL and a director of BCB. Straub, who was Vice Chairman of ODB Lux, was also a director of BCB and a director and Senior Vice President of IBL and IOS.

The Bank of New York further resisted the transfer of its functions as custodian of securities to American National. On April 25, 1972 Vesco appeared at the bank's office in New York and stated that he was present "primarily as a representative of ODB Lux and also because of his residual interest in IOS, including his personal contact with IOS." He announced that the bank was terminated as securities custodian and that it would be replaced by American National. A month earlier Vesco and ICC had announced to the shareholders and the public that "they had severed all their interests in IOS".

ICC had had a banking relationship with American National for many years. Snipes was an officer of the bank and a director of ICC. American National had apparently never acted as securities custodian for any fund or group of funds with anything approaching the assets of the Dollar Funds. The only mutual fund it served in a similar capacity had assets of $200,000, a tiny fraction of the Dollar Funds' total assets. Offi-

cers of American National did not make any representation concerning the services which American National could be expected to perform when they met with Vesco and Stoltenberg on April 20, 1972, at Vesco's offices at ICC in Fairfield, New Jersey, to discuss the possibility of American National becoming securities custodian for the Funds. It was apparent to Stoltenberg that "they [American National] did not have experience in dealing with mutual funds of this [the Dollar Funds'] size or this scope." Immediately after this meeting Stoltenberg had lunch with Beatty, who, Stoltenberg testified,

> . . . warned me that they were good people, but he said they were lacking in experience in this type of work and we would have to, you know, teach them for a little bit while they learned how to do this.

This appointment of American National as custodian of securities was a step towards the use of BCB as a sub-custodian of the securities, which as indicated above, was accomplished later in the year.

*E. The Global Transactions*

Vesco's interest in the concept of ABC N.V. persisted. He argued to the ICC Board that the Kilmorey transaction had not stopped the SEC investigation, and ICC would have to transfer VCL and IBL to another corporation to appease the SEC. Vesco asked for detailed opinions on tax and other aspects of the ABC N.V. plan in April and May 1972. He met with accountants at ICC to explain revisions in the ABC N.V. plan.

In May, ICC's counsel began work on draft legal agreements for the sale of the VCL and IBL shares. Counsel in New Jersey were retained by LeBlanc to represent the buyer (ABC N.V.). Initially, it was proposed that Fairfield General Corporation would be the buyer. This company had been created in early 1972, and shortly

thereafter its stock had been distributed as a dividend in kind to ICC shareholders. This plan was abandoned, however, since using Fairfield General, a United States public company, as the ABC N.V. vehicle would not avoid SEC problems. Counsel for the buyer then found GHL and GFL on a shelf of a law firm in Nassau, Bahamas. These companies were owned by IBL which on June 3, 1972 sold all the stock of GHL, i.e. five shares, to LeBlanc for $1,000. The purchase agreement was signed by Straub on behalf of IBL. On the same date, GHL purchased from IBL for $1,000 all of the stock of GFL.

On June 2, 1972, Vesco presented the proposed sale of ICC's interests in VCL and IBL to GFL for $7,350,000 at the ICC board meeting. Vesco told the board of ICC that an IOS Dollar Fund would invest in GHL and GFL. A lawyer representing ICC who was present at the meeting warned of the existence of a risk of liability for breach of fiduciary duties, in light of the interrelationship of the parties to the sale. ICC approved the transactions notwithstanding.

The closing of the transaction took place on June 3, 1972. ICC transferred to GFL (and GHL as guarantor) 1,760,763 shares of IBL and 2,360,767 shares of VCL, as well as the Kilmorey promissory notes for $300,000 and the HFS, IIL and VCL promissory notes. Also included in the package was a VCL promissory note for $935,000 which had been assigned to ICC by IOS purportedly as reimbursement for legal expenses incurred by ICC in connection with its investment in IOS.[5] In return, GFL transferred to ICC five unsecured promissory notes for a total of $7,350,000 at five percent interest payable over a five year period starting in July 1, 1973, and assumed IIL's obligation to indemnify ICC for tax liability. LeBlanc resigned as a director of IOS effective June 1, 1972.

On June 4, 1972, Vesco issued a press release reporting the sale of IBL and VCL

---

5. The note had been executed on February 8, 1972 by VCL payable to International Reinsurance Company Ltd., an IOS subsidiary. It was endorsed on April 15, 1972 by LeBlanc on be-half of the latter to IOS, then by LeBlanc on behalf of IOS to ICC, and finally on June 3, 1972 by LeBlanc on behalf of ICC to GFL (which was in effect LeBlanc).

and concluding that this transaction accomplished ICC's complete disposition of all of its investments in IOS. Vesco did not disclose that the value of VCL shares would increase dramatically as of June 29, 1972 when the VCL–IPI–PRL amalgamation closed.

### F. The Looting of the Funds

1. *Venture's investment of $20 million in GHL and GFL*

After the change of cash and securities depositories, Venture began a dramatic liquidation of its portfolio of United States securities ($40,827,900 in March 1972). In April, its net sales were $1,607,966. In May, its net sales were $7,790,270. Then in June, its sales of such securities were $22,386,406. In two months, Venture had liquidated over 75 percent of its portfolio.

The boards of the Dollar Funds met in Nassau on June 19 and 20, 1972. Meissner spoke of the importance of abandoning the policy of requiring prior board authorization for restricted investments and of reorganizing the Funds. During the meeting, Allan F. Conwill and Wilson Wyatt, independent members of the FOF Board of Directors, resigned.

After the general meeting broke up, Meissner convened a "Special Session" of the Venture Fund board meeting attended by Schuyler and himself. Buhl, the third individual director, was in the hospital. Meissner told Schuyler of a proposed $20 million investment by Venture in GHL and GFL. Schuyler objected to the proposal as involving too large a proportion of Venture assets in a single investment. Schuyler held a proxy from the fourth director, a corporation called Curacao Corporation N.V., which he voted half in favor and half against the transaction. With Meissner voting for and Schuyler against, Meissner as Chairman was then in a position to break the tie; thus the transaction was approved.

Meissner told Schuyler and later Graze told the Fund's lawyer that it was agreed there would be a "put" to Venture by the Globals, that is, that Venture could recover the money advanced if needed for redemptions. Nevertheless, there was no such agreement in the papers relating to the investment.

On June 21, 1972 about $18 million of Venture Fund money was transferred from BONY to correspondent banks and then to Nassau banks. The fund compliance officer, Bruno Lederer, was concerned about the legality of the transaction and refused to authorize payment of the $18 million to GHL and GFL. Schuyler then signed the authorization and Stoltenberg directed Lederer [6] to sign his name to the authorization (two names were required). Thereafter, appropriate instructions were issued directing payment of first $18 million and then $2 million.

On June 30, 1972, GFL prepaid the $7,350,000 due ICC out of the $20 million. The moneys were paid by World Banking Group, Nassau to an ICC account. Neither the ICC press release of July 3, 1972 nor the Form 8–K filed with the Commission by ICC showed the source of the funds used to pay ICC.

For the $20 million, Venture received 4,000,000 shares of Class B non-voting stock of GHL for $10 million and an unsecured debenture of $10 million by GFL at 7 percent interest. The investment, which on its face was a great risk, dissipated 44 percent of the net assets of Venture Fund.

2. *Amalgamation of VCL–IPI–PRL*

On June 1, 1972, (two days before ICC transferred its VCL shares to GFL) VCL sold substantially all of its assets to Property Resources Ltd. ("PRL"), a wholly owned subsidiary of VCL in exchange for stock of PRL. The consideration received by VCL was 10,000 common shares (all the voting stock) and 3,140,000 Class A shares of PRL (22½ percent of the non-voting stock).

---

**6.** When Lederer resigned on August 15, 1972, Meissner admitted to him that the transaction was not at arms length.

Among the assets received by PRL was the stock of IOSREH which held the voting shares of IPI.

Then, on June 29, 1972—twenty-seven days after the sale to the Globals by ICC—PRL acquired substantially all of the assets and liabilities of IPI in exchange for 10,810,000 Class A (non-voting) shares of PRL and cancellation of an IPI management contract held by IPI Management Co. Ltd. and valued at $15 million. The value of the IPI assets that were transferred was $95 million. This transaction carried out the essential purposes of the Newco proposal. The transaction was approved on behalf of IPI by its voting shareholder, IOSREH, the stock of which was owned by PRL. The question was never put to the public shareholders of IPI as they held non-voting stock.

## 3. *Inter-American*

During the period June 1972 to mid-August 1972, FOF Prop, a wholly owned subsidiary of Fund of Funds made net sales of readily marketable high grade United States securities in an amount exceeding $41 million. At Vesco's request, in July 1972 Cerny, a New York attorney retained by Vesco, reviewed papers for the incorporation of Inter-American Capital S.A. in Costa Rica and assisted in the formation of the company.

Authorization of an FOF Prop investment in Inter-American by the FOF Board of Directors appears to have been informal at best. John Schuyler, the Secretary of FOF and FOF Prop, testified that he attended a meeting on July 11, 1972 at the Esso Motor Hotel in Amsterdam dealing with the Dollar Funds.[7] Schuyler was told by Meissner in August 1972 that during a recess in that July meeting in Amsterdam, and while Schuyler was out of the room, Messrs. Meissner, Strickler and Howkins of the IOS staff had held a Board Meeting of FOF and authorized a $60 million investment in Inter-American. Schuyler had no prior notice of such a meeting; nor did he

send out notice to the directors. Neither did Schuyler ever see a copy of the minutes of that purported July 11, 1972 meeting.

On July 31, 1972, telex instructions signed by Bruno Lederer and Pierre Brugnon (an IOS telex operator) directed a transfer of $25 million from an FOF Prop account at the Bank of New York to an ODB Lux account for the account of FOF. On August 10, 1972, another $25 million was similarly transferred. On August 14, 1972 an additional $10 million was transferred from the FOF Prop account at BONY to an account of ODB Lux in favor of FOF. For each of the three transfers, promissory notes were executed by New York attorneys for FOF which obligated FOF for the moneys purportedly loaned to it by FOF Prop. The moneys were redesignated by ODB Lux back to FOF Prop and moved by ODB Lux through New York and London banks and ultimately to BCB in Nassau.

Bruno Lederer, the compliance officer for the Dollar Funds, signed the first telex moving $25 million on July 31, 1972 after Graze advised him that the purpose of the transfer was to get money out of BONY. Graze told Lederer that BONY was "tying up the Fund's money" and not "allowing the Board of Directors of the Fund to exercise the right to investment judgment." Lederer issued instructions for the second $25 million over the signatures of Meissner and Strickler after receiving an authorization telex from Meissner.

On August 11, 1972, Lederer received a telex from Meissner directing him to process recommendations on moving the $60 million. Unable to obtain information concerning the huge transfers, Lederer sent a telex to ODB Lux, urging that no Fund moneys be transferred out of the bank's custody except for payment of actual transactions. Lederer then sent a telex to Graze:

In view of the enormous and unprecedented transfers of money to Nassau for FOF Propriety Funds, Ltd., I am as-

---

7. Those present included Vesco, LeBlanc, Meissner, Graze, Clay, Straub, Strickler, Wey-

mar, Schuyler, various lawyers and members of the IOS staff.

tounded that no one has seen fit to advise me of the details of the investment being contemplated or for that matter, of the entire new direction the Fund seems to be taking.

In response to his telex, LeBlanc advised Lederer that the $60 million was going to Inter-American. Four days later, on August 15, 1972, Lederer resigned.

On August 16, 1972, Meissner and Schuyler executed a one-page subscription letter agreement in which FOF Prop agreed to purchase 6,000,000 shares of the preferred capital stock of Inter-American for $60 million. Although the letter agreement provided that FOF Prop was entitled to receive its money back if it did not receive its bearer shares within thirty days, the shares were not delivered to the custodian (ANBT) until April 5, 1973, after commencement of hearings on the preliminary injunction.

The prospectus of Inter-American, drafted at the direction of LeBlanc, contained the following statement on investment restrictions:

No limitations are placed on the percentage of the company's assets which may be invested in any one company, or the percent of any one investment situation or type of investment that Inter-American Capital may own.

It contained no financial statements, no description of the organizational structure of the company, nor even the names of persons in a control relationship with the company. The prospectus stated that the company had its domicile and principal headquarters in Costa Rica, and that the investment intentions of the company were worldwide and would be sought in "developing countries of the world." Specifically, it stated:

Inasmuch as the company has just commenced operations, it is contemplated

that a significant part of the proceeds from this offering will be invested in one or more closed-end investment companies incorporated under the laws of Panama.

The closed-end investment company in Panama was Phoenix Financial S.A., a Panamanian corporate shell with bearer shares. Cerny had obtained this corporate shell from New York and Panamanian attorneys in July at the request of Vesco and Straub and had delivered the corporate papers to a Panamanian attorney. In August 1972, at Vesco's request, Cerny had an additional class of stock authorized for Phoenix Financial (10,000 preferred shares, without voting rights, in bearer form) and arranged for Phoenix Financial to authorize execution of a contract with Trident Bank to administer the former's assets. Trident Bank, formerly Overseas Development Bank (Bahamas), was owned by IBL. Its directors at this time included LeBlanc and Cerny.

It appears that $54 million of the FOF Prop money was used by Inter-American to purchase the new class of nonvoting preferred stock of Phoenix Financial. In any event, the $60 million has disappeared.[8]

### 4. *EHG Enterprises, Inc.*

EHG Enterprises, Inc. ("EHG") was a real estate development company formed in Puerto Rico by two brothers, Ariel and Enrique Gutierrez. In the spring of 1972, EHG retained Hornblower & Weeks-Hemphill, Noyes as its financial adviser to obtain private long-term financing. Hornblower & Weeks recommended a private placement of $6 million of fifteen year notes with warrants. In June 1972, prospective investors were contacted concerning the private placement, but by the end of August 1972, EHG had not yet had success in obtaining financing.

---

**8.** Michael Bennett, Controller of IBL until April 13, 1973 was informed in mid-September 1972 by one of the independent auditors for BCB, who was then engaged in his audit, that the $60 million was first carried in an account at BCB for ODB Lux which was designated for the account of FOF; that subsequently, instructions had been received from ODB Lux to hold the $60 million for the account of Inter-American; that subsequently, the account of Inter-

American was debited for $60 million and the account of Phoenix Financial was credited for that amount; and that subsequently, the account of Phoenix Financial was debited and the account of Trident was credited for $60 million. As a result of conversations with Michael McGlinchey, Treasurer and director of Trident, Bennett understood that Trident was in turn holding the $60 million for Phoenix Financial.

The Gutierrez brothers were related to Alberto Alvarez, a director of EHG and an adviser to President Figueres of Costa Rica. Alvarez had previously met Vesco in Costa Rica in connection with the San Cristobal transaction which involved an investment by IIT in a Costa Rican entity. Alvarez arranged for the Gutierrez brothers to meet Vesco, Straub and Meissner. Vesco and his group had received the Hornblower report on the $6 million private placement proposal for EHG. Vesco and Meissner suggested additional financing beyond the $6 million recommended by Hornblower. Ariel Gutierrez left this meeting with Vesco and Meissner with the "general understanding" that EHG would obtain $12 million in financing consisting of $2.5 million of equity and $9.5 million of subordinated debt. Ariel Gutierrez also asked Vesco for assistance in repurchasing some 200,000 shares of EHG that had been purchased in 1969 by Capital Growth Fund for $2 million. Vesco responded by stating that a "banking source" could lend Gutierrez the sum of $1.3 million.

During the week of September 11, 1972, the Gutierrez brothers and their attorneys met in London with Vesco, Clay, LeBlanc, Meissner, Strickler and Straub. Contracts were executed dated September 12, 1972 under which Venture Fund acquired EHG convertible preferred stock for $2.5 million and IIT contracted to purchase for $9.5 million a subordinated debenture due in fifteen years of EHG International Finance Corporation N.V. ("EHG Finance"), a wholly owned subsidiary of EHG. During the same week in London, it was agreed that BCB (represented at the closing by LeBlanc, Vesco and Weymar) would lend Ariel Gutierrez $1.3 million to purchase the 200,000 shares of EHG stock owned by Capital Growth Fund. As part of this transaction, Gutierrez granted BCB a three year option to purchase 100,000 EHG common shares for $650,000.

The EHG transaction closed in Nassau on September 28, 1972. The Funds disbursed $12 million, of which EHG received $6 million and the remaining $6 million was placed in a negotiable certificate of deposit at BCB, payable to bearer in 181 days. Ariel Gutierrez agreed on the same date in a meeting with Vesco, LeBlanc and Clay to commit the second $6 million to a real estate venture of an unidentified client of BCB. This side agreement (which in form was between BCB and EHG International) was reduced to writing and signed by Gutierrez. It provides in pertinent part:

We have agreed with you that EHG International Finance Corp., N.V., will purchase $6,000,000 (U.S.) of debentures in a real estate company being formed by a customer of your bank capable of meeting the terms and conditions of said debentures. These debentures will have substantially the same terms and conditions as a recent $9,500,000 (U.S.) debenture with which we are both familiar. It is understood and agreed that the sole purpose of depositing the aforesaid certificate of deposit with your bank, which we are doing simultaneously with the execution of this letter, is to insure that we will purchase the debentures of the real estate company as set forth above within 181 days from the date hereof. If we have the opportunity to, but nevertheless do not purchase the debentures of the real estate company within 181 days from the date hereof, we forfeit and transfer to you immediately thereafter, all right, title and interest in said certificates of deposit without notice or further consideration to us. If, however, we do purchase said debentures within 181 days from the date hereof, or if we do not have the opportunity to purchase said debentures, you will return said certificate of deposit to us on the 182nd day hereafter.

As a result of this arrangement, Vesco and LeBlanc had at their disposal for possible real estate investments $6 million of IIT money at least for six months.

After this action was commenced and just before the hearings on a preliminary injunction began, the side agreement was terminated. Straub delivered to Gutierrez a letter dated December 19, 1972 which stated that the bank's clients were "unable"

to fulfill the "terms and conditions" of the transaction "contemplated" in the side agreement of September 28, 1972, and that therefore the certificate of deposit would no longer be held under that agreement and could be hypothecated with BCB for lines of credit. EHG went into bankruptcy thereafter.

### 5. San Cristobal

In the first half of 1972, Vesco began to look at the possibility of establishing a headquarters in Costa Rica. Richard Pistell, a friend of Vesco and LeBlanc, introduced Vesco to Jose Figueres, then President of Costa Rica. Pistell who described himself as a "promoter" testified:

My whole realm [sic] with Mr. Vesco as far as Costa Rica was concerned, which was the one thing that Mr. Vesco was harping on like a broken record, was relocating his local headquarters of fund banking, monetary financial complex, to a new location and my primary interest was going down there on my own to look at the cattle business.

The Figueres family had a controlling interest in a Costa Rican entity known as Sociedad Agrida Industrial San Cristobal, S.A. ("San Cristobal"). Pistell advised Vesco that Figueres was seeking financing for San Cristobal.

In July 1972, IIT purchased an unsecured promissory note of San Cristobal payable in five years with interest at 7 percent for $2,150,000. IIT also received warrants to purchase 500,000 shares of San Cristobal. In addition, Trident Bank received bearer warrants to purchase 1,000,000 shares for $1.00 for five years. The papers memorializing the transaction were prepared by Cerny who was furnished the terms thereof by Vesco, LeBlanc and Meissner.

The loan by IIT violated an IIT regulation which provided:

In no event shall the Fund make any loan to any person (living or a creation of the law) unless such loan is either guaranteed by a government or by an international organization or by a corporation having a net worth in excess of U.S. $1,000,000, or its equivalent.

The evidence indicates that the securities obtained by IIT were not readily marketable and that the investment was improper.

### 6. Vencap

In October 1972, IIT purchased for $3 million 30,000 non-voting Redeemable Preference shares of $100 par value of Vencap Ltd. This was a shell company organized by Pistell in July 1972 with a capital of $5,000. Pistell owned all of the outstanding common stock. A letter agreement covering this investment was signed by Meissner on behalf of IIT. Vencap used $590,000 of the money obtained from IIT to make a personal loan to Pistell. The transaction was arranged by Vesco and members of his group for the personal benefit of Pistell. It involved securities of little or no value and was improper.

### 7. INCAP

International Capital Investments, Ltd. ("INCAP"), a Bahamian corporation, entered into an agreement dated July 17, 1972 with Transglobal Financial Services Ltd. ("Transglobal") under which INCAP contracted to provide various financial services to Transglobal. LeBlanc owned 96 of the 100 shares of INCAP. The agreement, which was signed by Meissner for Transglobal and by Graze for INCAP, had a minimum term of four years. It provided for a monthly fee of $30,000 plus $\frac{1}{10}$ percent of the average monthly net assets of the Dollar Funds. Transglobal, which was 80 percent owned by IOS (the remaining 20 percent of the stock was publicly owned) had four subsidiaries, each of which acted as manager for one of the Dollar Funds. The services included in the INCAP arrangement had prior thereto been provided by Transglobal and its subsidiaries.

By this agreement, members of the Vesco group were able to obtain substantial payments to which they were not entitled for services which if indeed rendered were hardly needed.

### 8. Vector

Among the banks acquired by IBL from IOS in October 1971 (see p. 6 above) were

ODB Bahamas (later known as Trident Bank) and ODB Curacao, N.V. which owned certain assets carried at a nominal value. In February 1972, by agreement dated December 31, 1971, these and other banks were sold for $1 to Vector, Ltd., a Bahamian company. The agreement was signed on behalf of IBL by Weymar and for Vector by LeBlanc. Vector was the creation of Vesco and LeBlanc; Straub was President and a director, Cerny was Secretary and also a director.

ODB Bahamas held various debt securities of Commonwealth United Corporation which, following financial problems, had gone into reorganization in 1971. At that time these securities were carried on the books of the bank at $1. However, by the end of 1971, a reorganization plan was under consideration and Solomon advised LeBlanc in October 1971 that, if the plan were achieved, it would result in restoring substantial value to the debt securities held by ODB Bahamas. The sale of ODB Bahamas to Vector for $1 was thereafter accomplished. The reorganization plan was effected in the fall and pursuant thereto Vector received $3,400,000.

When acquired by Vector, ODB Curacao, N.V. held 100 Class B shares of an IOS real estate company which it had purchased for a nominal consideration. In April 1972, these shares were transferred by Vector to VCL in exchange for a promissory note in the amount of $600,000.

As a result of these two transactions, Vector defrauded the stockholders of IOS, VCL and IBL.

### 9. Gulf Stream

In 1972, Pistell introduced Vesco to the president of Resorts International, which operated a casino, hotel and other properties on Paradise Island off Nassau, Bahamas. Vesco developed a plan under which a newly formed corporation, Gulf Stream (Bahamas) Ltd., would acquire certain assets of Resorts International for $25 million. To finance this purchase, IIT would invest $15 million in Gulf Stream, which would be 40 percent owned and controlled by Straub.

At the direction of ODB Lux, American National in October 1972 transferred $15 million of IIT funds to BCB earmarked for the Gulf Stream investment.

The transaction was not consummated after this action was brought in November 1972, but IIT never recovered the $15 million from BCB.

### Subject Matter Jurisdiction

A review of the factual record establishes that we have subject matter jurisdiction over the instant action pursuant to Section 27 of the Securities and Exchange Act, 15 U.S.C. § 78aa. To reach this conclusion, we have weighed the various factors relevant to a determination of the applicability of the federal securities laws to a transaction with both United States and foreign elements. The shareholders of the IOS funds, on whose behalf this action was brought in large part, are mostly foreigners. Also the corporations in the IOS complex and the shell corporations created in connection with the fraud were at least formally foreign, which is not surprising in light of the substantial energy devoted to escaping the reach of the United States securities laws. Although these factors are certainly significant, they are by no means dispositive. As the Court noted in *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 987 (2d Cir. 1975), "Congress did not mean the United States to be used as a base for fraudulent schemes even when the victims are foreigners." Nor were the shareholders defrauded by the defendants' scheme entirely foreign. ICC, at the center of the scheme, was a United States corporation whose shares were publicly traded. Its shareholders were directly affected by the fraudulent activity, both in terms of expenditures made by ICC in connection with the activities of the Vesco group and impact on the value of the shares from such fraudulent transactions as the sale of VCL shares by ICC prior to the undisclosed VCL–IPI–PRL amalgamation. *See Schoenbaum v. Firstbrook,* 405 F.2d 200, 208–09 (2d Cir. 1968), *hearing en banc* 405 F.2d 215.

Moreover, significant conduct in furtherance of the fraud occurred within the United States. *See IIT v. Cornfeld,* 619 F.2d 909 (2d Cir. 1980); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972). The scheme in question began with ICC's and Vesco's control over IOS, was consolidated through the takeover of the mutual funds and the transfer of valuable assets of IOS to shell companies, and concluded following liquidation of blue chip United States securities from the Dollar Funds with the transfer of millions of dollars into shell corporations controlled by the Vesco group. Many of the acts essential to the execution of this complex scheme took place in the United States. The vehicle for establishing control over the IOS funds was a United States corporation some of whose officers were at the center of the scheme from the outset and who continued to participate in and direct the transactions after ICC formally divested itself of shares of IOS and its subsidiaries. The Kilmorey, Global and Venture transactions are examples of ICC's central role in the fraudulent scheme and its impact in the United States. Many of the meetings at which critical decisions in furtherance of the project took place at ICC's offices in Fairfield, New Jersey. Some of the meetings took place at the offices of one or more of the several United States law firms that were employed by ICC and IOS to carry out the transactions. The IOS funds maintained depository accounts at BONY and ANBT. FOF personnel spent substantial amounts of time at ANBT instructing the staff as to procedures and facilitating the transfer of custodianship. The transfer of custodianship was a significant element in the execution of the plan to liquidate the Dollar Funds. Numerous misrepresentations were made in ICC press releases and forms filed with the SEC by ICC in connection with the scheme. Also significant in establishing subject matter jurisdiction is the substantial use of United States mail and telephone in carrying out the various transactions.

### Liability

■ Each of the defendants in the Vesco group violated the securities laws. Each of these defendants in their respective capacities as officers and directors of IOS, ICC and the various subsidiaries and shell corporations involved knowingly participated in a series of transactions in which millions of dollars were diverted from the Dollar Funds to shell corporations in their control. *See Superintendent of Insurance v. Bankers Life Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

Vesco served as Chairman of the Board and Chief Executive Officer of ICC, Chairman of the Board, Chairman of the Finance Committee and a member of the Executive Committee of IOS, a director of BCB, director of IBL, director and President of Value Capital and director of Transglobal Financial Services ("Transglobal Financial").

LeBlanc came to I.O.S. in July 1971 from Coopers & Lybrand where he was the partner in charge of the IOS audit. He was Executive Vice President, Chief Financial Officer and director of IOS, director of Transglobal, director of IBL, President and director of Global Holdings and Global Financial and President, Treasurer, director and one of the four stockholders of Kilmorey (the others being Meissner, Strickler and Graze). He was the principal actor in the transaction which resulted in Global acquiring the interests of ICC in Value Capital and IBL. He has been a dominant factor in the operation of BCB and has actively participated in many of the other dealings in issue.

Meissner was Vice President and Treasurer of ICC Investments, a wholly owned subsidiary of ICC, and along with Vesco was one of the two designees of ICC to the management of IOS at the time Vesco, through ICC, took over control of IOS in September 1970. He served as Executive Vice President, President and director of IOS, President and director of Transglobal Financial, President and director of three of the Dollar Funds (FOF, Transglobal and Venture) and their respective management companies, President and director of I.I.T. Management Co. and a stockholder of Kilmorey.

He was also one of the four stockholders in Kilmorey and a principal organizer of the transaction in which Venture provided Global with the funds necessary to acquire ICC's investments in IOS, Value Capital and IBL. As a director of FOF and FOF Prop, he approved the transfer of $60 million to Inter-American.

Strickler served as a director of IOS, director of three of the fund management companies and director, officer and stockholder of Kilmorey. Like Meissner, he also came from an ICC subsidiary of which he was President (American Interland, Ltd., later renamed Hemispheres Financial Services, Ltd.), which subsidiary acquired 6,000,-000 shares of IOS preferred stock from Bernard Cornfeld in January 1971. As a director of FOF he approved the $60 million investment in Inter-American and, although he was a director of IIT management, he participated in the EHG investment which, in part, was intended to lock up $6 million of that investment in BCB.

Graze became portfolio manager of and investment adviser to the Dollar Funds in January 1972 and was involved in the liquidation of the securities portfolio of these funds in 1972. He was a director of Transglobal Financial and a stockholder in Kilmorey. Graze procured Stoltenberg as the necessary signatory for the movement of $20 million from Venture to Global after he had been unable to persuade Lederer to perform such role. He participated actively in the transfer of $60 million from FOF to Inter-American.

Straub had been director of European Services, an ICC subsidiary, from August 1970 to April 1972 during which period he actively functioned in the management of IOS at the behest of Vesco. He was a director and officer of BCB and of ODB Lux. He signed the contract as Senior Vice President of IBL under which IBL sold Global Holdings to LeBlanc for $1,000 and also the contract under which IBL sold Global Financial to Global Holdings for $1,000. He was an active participant in that portion of the Inter-American deal which involved Phoenix and was slated to receive 40 percent of the stock of Gulf Stream in the aborted Gulf Stream transaction.

Clay served as an officer of ICC, Treasurer of IBL, director of BCB, director of Value Capital and President and Chairman of the Board of ODB Lux.

Nor is there any question as to the appropriateness of the entry of an order of disgorgement as to these defendants. As the Court held in *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972):

> The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.

Accordingly, the SEC's motion for entry of a permanent injunction against Stanley Graze and an order directing Vesco, LeBlanc, Meissner, Strickler, Graze, Clay and Straub to make an accounting to the court and restitution for moneys misappropriated is granted to the extent of our findings of fact and conclusions of law. Plaintiff shall submit an appropriate order.

SO ORDERED.